IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| GLYTEC LLC, | ) | No. 6:25-cv-03211-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| PRISMA HEALTH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's Motion for Reconsideration or Clarification, Defendant's Motion to Dismiss, and Defendant's Motion to Strike. ECF Nos. 52, 18, 19. Plaintiff filed Responses in Opposition to Defendant's Motions, and Defendant filed Replies. ECF Nos. 57, 31, 30, 59, 40, 38. The Motions are now ripe for review. For the following reasons, Defendant's Motion for Reconsideration or Clarification is denied as to the request for reconsideration and granted in part and denied in part as to the request for clarification, Defendant's Motion to Dismiss is denied, and Defendant's Motion to Strike is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff is a Delaware limited liability company that operates within the healthcare technology field, providing insulin management software solutions to hospital systems via

---

[1] On a motion to dismiss, a plaintiff's well-pled allegations are accepted as true. Accordingly, this recitation of facts is taken from Plaintiff's Amended Complaint. ECF No. 1-1 at 46–77.

a licensing agreement.  ECF No. 1-1 at 48–49.  Plaintiff's patented and Food and Drug Administration's ("FDA")-cleared insulin management software solutions are licensed under the Glucommander name.  *Id.* at 49.  In 2006, Plaintiff's parent company and Defendant's "predecessor in interest," Greenville Hospital System ("GHS"), entered an "Equipment and Software Evaluation Agreement" whereby Plaintiff provided GHS with insulin management software.  *Id.* at 54.  In 2007, Defendant was formed by the merger of GHS and another hospital system, and in the years following the merger, the Parties entered into subsequent license agreements for use of Plaintiff's glucose management software, including the Glytec Master Service Agreement (the "Agreement").  *Id.* at 53–54.  Section 2.2 of the Agreement provides, in relevant part:

> [Defendant] shall not and shall not permit anyone else (including its Affiliates) to, directly or indirectly, copy, reproduce, amend, modify, create derivative works of, adapt, translate, distribute, reverse engineer, reverse assemble, disassemble, decompile, attempt to discover the source code or structure sequence or organization of any software accessed or provided hereunder. . . . [Defendant] shall not, directly or indirectly, and shall not permit anyone else (including its Affiliates) to access or use the Glytec Services or Documentation in any manner in connection with or to develop a commercially available or competing product or service. . . . The Glytec Service is a product proprietary to [Plaintiff] based upon and containing trade secrets and other confidential information of [Plaintiff], and [Plaintiff] owns all right, title, interest, including all intellectual property rights, in and to the Glytec Service and documentation.

*Id.* at 55.  Plaintiff also alleges the Parties agreed that Defendant's healthcare professionals could use Plaintiff's service "solely for the treatment of patients in accordance with the terms of this Agreement."  *Id.*  As part of Plaintiff's service, Plaintiff allegedly provided to Defendant a Testing/Sandbox site (the "Test Site") that Defendant's clinicians could use as a training environment and information technology (IT) personnel

could use for testing upgrades to the Plaintiff's services, and as part of the Agreement, the Test Site was intended to be used solely by clinicians or IT personnel in connection with their treatment of patients and was not to be used as an aid to developing or testing software to replace Glucommander.  *See id.*  Defendant breached these terms by "illegally reverse engineering [Plaintiff]'s trade secret algorithms" and misappropriated Plaintiff's trade secrets, by allowing its employees to access or use Plaintiff's test site to develop a commercially available or competing product or service, and by using documents, forms, reports, and user manuals provided as part of the Plaintiff's services to create similar documents, forms, reports and user manuals for the Prisma Software.  *See* ECF No. 1-1 at 47, 56–64, 66–68.

Specifically, beginning in 2022 Defendant began to discuss developing its own insulin management system and tasked its employee, Laura Turman, with developing a replacement for Glucommander.  *Id.* at 56–57.  Beginning in May 2023, Defendant's employees set about figuring out how Glucommander adjusts its multiplier through reverse engineering and testing its own software against Glucommander to determine whether it would get the same results.  *Id.* at 57–61.  Turman held meetings with Defendant's employees discussing aspects of Glucommander that she still needed to "crack the code" on so that Defendant could terminate its agreement with Plaintiff and begin using its own developed software.  *Id.* at 61–64.  Specifically, Defendant sought to "mimic" Plaintiff's algorithms for insulin dosages Glucommander would recommend in various scenarios and mimic Plaintiff's proprietary MeterMax formula and functionality.  *Id.* at 59–60.  Defendant also sought to determine how Glucommander accounted for carbohydrate intake to calculate the recommended insulin infusion rate.  *Id.* at 60.  In

3

email correspondence, Defendant's employees stated they believed some of the information was "proprietary" to Plaintiff and suggested using the Test Site to gather additional information. *Id.* at 60–61. Turman acknowledged that Plaintiff's "algorithms were not publicly available" and "lament[ed] that [Plaintiff]'s algorithm 'is not even published.'" *Id.*at 61. At least one of Defendant's employees sought to obtain information from Plaintiff to assist in the development of its own competing software under the guise of seeking information to assist patients using Glucommander. *Id.*

Turman and other employees of Defendant used Plaintiff's Test Site to run patient simulations to further their efforts to reverse engineer Plaintiff's software. *Id.* at 59, 65. Through its reverse engineering efforts, Defendant was able to create glucose management software (the "Prisma Software") to mimic Glucommander's functionalities. *Id.* at 62. On February 13, 2024, by email, Plaintiff asked for a meeting with Defendant related to its scheduled renewal. *Id.* at 63. The email was then forwarded to others on the team, with one commenting, "Yikes, looks like they are on to us!" *Id.* On or about February 15, 2024, Prisma gave written notice to Glytec of its intent to terminate the Agreement effective on May 19, 2024. *Id.* In 2024, Turman began presenting the Prisma Software to Defendant's employees and by March 5, 2024, Defendant began treating patients with the Prisma Software. *Id.* at 63–64. In March 2024, Plaintiff advised Defendant in writing of its concerns that Defendant had breached the Agreement by using the Plaintiff's services to develop the Prisma Software. *Id.* at 65. While Defendant initially ignored Plaintiff's communication, in response to a second written communication, Defendant claimed that it acquired glucose management software from another provider and that it would provide proof to Plaintiff that it did so. *Id.* Defendant later refused

4

provide any information showing that it acquired a replacement glucose management product from a third party.  *Id.* at 65–66.  Defendant continued to use Plaintiff's Test Site to run patient simulations on the Prisma Software it created through reverse engineering through April 22, 2024.  ECF No. 1-1 at 56–60; 64.

## B.  Procedural History

On July 12, 2024, Plaintiff filed this action in the Court of Common Pleas for Greenville County, South Carolina as Civil Case No. 2024-C-23-04312.  ECF No. 1 at 1. Based on Defendant's alleged conduct, Plaintiff brought several causes of action, including claims for breach of contract; breach of contract accompanied by a fraudulent act; violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et. seq.; and unjust enrichment.  ECF No. 1-1 at 11–16.  On April 15, 2025, Plaintiff amended its complaint to add claims for misappropriation of trade secrets under both the Federal Defend Trade Secrets Act ("FDTSA"), 18 U.S.C. § 1836 et seq., and the South Carolina Trade Secrets Act ("SCTSA"), S.C. Code Ann. §§ 39-8-10, et seq. ECF Nos. 1 at 2; 1-1 at 68–72.  On April 16, 2025, Defendant filed a Notice of Removal to this Court.  *See* ECF No. 1.

On April 23, 2025, Plaintiff filed its Motion for Preliminary Injunction, seeking to enjoin Defendant from disclosing or disseminating any of Plaintiff's trade secrets or confidential information, by presentation or otherwise, either directly or indirectly, of the Prisma Software, which was allegedly developed from, and to compete with, Glucommander and seeking Defendant be enjoined from marketing, promoting, selling, licensing, offering for sale, offering for license or transferring the Prisma Software and

from altering, erasing, deleting, destroying, or modifying any version of the Prisma Software.  ECF Nos. 10-4 at 2–3; 35.

A hearing on Plaintiff's Motion for Preliminary Injunction was held on May 20, 2025. ECF No. 36.  On June 25, 2025, the Court entered an Order granting in part Plaintiff's Motion for Preliminary Injunction.  ECF No. 45.  On July 7, 2025, Defendant filed a Motion for Reconsideration or Clarification re the Court's Order on the Motion for Preliminary Injunction.  ECF No. 52.  Plaintiff filed a Response in Opposition to Defendant's Motion for Reconsideration or Clarification, and Defendant filed a Reply.  ECF Nos. 57, 59.

On April 30, 2025, Defendant filed a Motion to Dismiss and Motion to Strike Jury Demand.  ECF Nos. 18, 19.  Plaintiff filed Responses in Opposition, and Defendant filed Replies.   ECF Nos. 30, 31, 38, 40.   Defendant's Motion for Reconsideration or Clarification, Motion to Dismiss, and Motion to Strike are now ripe for review.

## II.  APPLICABLE LAW

### A.  Motion for Reconsideration

Any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b). The Fourth Circuit has held that that motions under Rule 54(b) are "not subject to the strict standards applicable to motions for reconsideration of a final judgment."  *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991) (finding it "unnecessary to thoroughly express [Fourth Circuit's] views on the interplay of Rules 60, 59, and Rule 54").  In deciding these motions, district courts have looked to the standards

of motions under Rule 59 for guidance. *Sanders v. Lowe's Home Ctrs, LLC*, C.A. No. 0:15-cv-02313-JMC, 2016 WL 5920840, at *2 (D.S.C. Oct. 11, 2016). "Therefore, reconsideration under Rule 54(b) is appropriate on the following grounds: (1) to account for an intervening change in controlling law; (2) to account for newly discovered evidence; or (3) to correct a clear error of law or prevent manifest injustice."[2] *South Carolina v. United States*, 232 F. Supp. 3d 785, 793 (D.S.C. 2017).

A motion to reconsider an interlocutory order is not an appropriate vehicle to rehash arguments already considered by the court because the movant is displeased with the outcome. *See Ashmore v. Williams*, 8:15-cv-03633-JMC, 2017 WL 24255, at *3;

---

[2] Courts in this district have recognized that:

> The Fourth Circuit has suggested that the law of the case doctrine has evolved as a means of guiding a district court's discretion in deciding a Rule 54(b) motion for reconsideration of an interlocutory order. *Am. Canoe Ass'n*, 326 F.3d at 515. Under the law of the case doctrine, an earlier decision of the court becomes the law of the case and must be followed unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks omitted), *cited with approval in Am. Canoe Ass'n*, 326 F.3d at 515. This court notes that the three reasons for overcoming the law of the case doctrine mirror the three reasons for granting relief under Rule 59(e). *See United States v. Duke Energy Corp.*, No. 1:00cv1262, 2014 WL 4659479, at *3 n.4 (M.D.N.C. Sept. 17, 2014).

*South Carolina v. United States*, 232 F. Supp 3d at 793. The Fourth Circuit has clarified that "[t]his standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of new evidence not available at trial." *Carlson v. Bos. Sci. Corp.,* 856 F.3d 320, 325 (4th Cir. 2017) (internal quotation marks and citation omitted).

*Sanders v. Wal-Mart Stores E.*, No. 1:14-cv-03509-JMC, 2016 WL 6068021, at *3 (D.S.C. Oct. 17, 2016).  Nor may a movant raise new arguments or evidence that could have been raised previously.  *See Nationwide Mut. Fire Ins. Co. v. Superior Solution, LLC*, No. 2:16-cv-423-PMD, 2016 WL 6648705, at *2 (D.S.C. Nov. 10, 2016); *Regan v. City of Charleston*, 40 F.Supp.3d 698, 701 (D.S.C. 2014).  In assessing a motion under Rule 54(b), these standards are not as strictly applied as they would be if the order were a final judgment and reconsideration were sought under Rule 59(e).  *Am. Canoe Ass'n*, 326 F.3d at 514–15.

## B.  Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). In a Rule 12(b)(6) motion, the court is obligated "to assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in the light most favorable to the

nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id*.

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### III. DISCUSSION

#### A. Motion to Reconsider

Defendant asks the Court to reconsider or clarify its Order granting in part Plaintiff's Motion for Preliminary Injunction. *See* ECF No. 52-1. Defendant identifies three areas for reconsideration or clarification by the Court. *See id.* at 2–10. First, Defendant asserts that the Preliminary Injunction imposes restraints as to Plaintiff's trade secrets without defining those trade secrets and where Plaintiff admits it has not disclosed its trade secrets. *Id.* at 2–7. Accordingly, Defendant requests clarification and that Plaintiff identify the trade secrets as set forth in the Court's Preliminary Injunction. *Id.* at 7. Second, Defendant argues that the Preliminary Injunction is contradictory on whether Defendant may or may not utilize the Prisma Software that is hosted on its third-party platform, Epic. *Id.*at 7–9. Third, Defendant contends that the Preliminary Injunction grants inconsistent relief by requiring that Defendant both preserve all communication and documents

regarding Plaintiff's trade secrets and retrieve and return all documents containing any of Plaintiff's trade secrets. *Id.* at 9–10.

Plaintiff argues that Defendant has failed to establish any grounds for reconsideration based on any of its three contentions as it has not identified any intervening change in the law or any new evidence and does not specifically state that the Court needs to "correct clear error of law or prevent manifest injustice." ECF No. 57 at 2–3. Plaintiff further contends that the Court need not provide further definition of trade secrets as requested by Defendant and that the Court's description of the trades secrets satisfies Federal Rule of Civil Procedure 65. *Id.* at 3–4. Plaintiff also argues that the Preliminary Injunction prevents Defendant from revealing Plaintiff's confidential information or sharing the Prisma Software, which provides more than enough clarity on what information Defendant is enjoined from disseminating. *Id.* Plaintiff asserts that the Preliminary Injunction allows Defendant to continue to use the Prisma Software hosted on the third-party platform to treat patients but clarifies that Plaintiff does "not seek to preliminary enjoin [Defendant] from such use." *Id.*at 5. Finally, Plaintiff argues that the Preliminary Injunction does not require Defendant to take "inconsistent" actions because it allows Defendant to maintain a copy of the documents and states that doing so would allow Defendant to comply with both its duty to preserve and its duty to retrieve and return. *Id.* at 5–6.

Having reviewed the applicable law and the arguments and submissions of the parties, the Court denies Defendant's Motion to the extent it seeks reconsideration. As an initial matter, Defendant has not identified any changes in the law, new evidence, or any other compelling argument that would support reconsideration. *See* ECF Nos. 52;

10

52-1; 59.  Further, Defendant does not specifically state any clear error or manifest injustice that needs correction.  *Id.*  Rather, Defendant specifically asks for clarification from the Court on three matters discussed in the Court's Order granting the Preliminary Injunction.  *See* ECF Nos. 52-1 at 1, 8–9, 10; 59 at 2, 5, 9–10.  To the extent that Defendant meant for the three specified matters to be addressed as clear error or resulting in manifest injustice, the Court finds that reconsideration is not warranted on any of these matters.

First, the Court finds that Defendant's challenges to whether Plaintiff has sufficiently identified with specificity which trade secrets are at issue in this action are simply a rehashing of arguments the Court has already considered where Defendant disagreed with the outcome.  The Court clearly set out what it meant by "trade secrets" in its Order granting Plaintiff's Motion for Preliminary Injunction.  *See* ECF No. 42 at 8–10.  Specifically, the Court provided:

> The Court finds Plaintiff has shown a likelihood that its algorithms—including dynamic adjustment of the multiplier, proprietary timing of blood glucose checks, management of hyperglycemic crisis, mealtime insulin dosing recommendations, and intravenous to subcutaneous insulin transition recommendations—developed for Glucommander's software system constitute "trade secrets". . . .
>
> [T]hese trade secret algorithms included the nuances of "the times when [Glucommander] does not follow the rules" in making specific adjustments for patient treatment.
>
> . . .
>
> This information regarding the configurations of Glucommander and how its software resolves conflicting clinical inputs is protected as "trade secrets" . . . .

11

*Id.* Defendant argues that the Court's explanation of what constitutes trade secrets is nothing more than a "hazy grouping of information" because the Court "does not define what specific formulas or process within these categories" comprise the trade secrets. ECF No. 59 at 7. The Court disagrees. In its prior Order, the Court identified the specific algorithms, and what those algorithms specifically calculated, that constituted trade secrets and put Defendant on sufficient notice as to what algorithms are covered as "trade secrets" by the Preliminary Injunction as is required by Rule 65. Accordingly, to the extent Defendant seeks clarification on this portion of the Preliminary Injunction, this request is denied. Further, the Court also finds no basis for reconsideration of this portion of the Preliminary Injunction.

Second, the Court finds that the Preliminary Injunction allows Defendant to utilize the third-party platform on which the Prisma Software is housed for the sole purpose of treating patients. To the extent there was any confusion on whether this conduct was permitted by the Preliminary Injunction, the Court now clarifies, and Plaintiff concedes, that use of the Prisma Software for "direct patient care," includes maintaining the Prisma Software in working condition on the third party platform on which it is hosted. The Court also clarifies that the Preliminary Injunction's restrictions and protections extend to Epic, the third-part platform, in the same way it extends to Defendant's clinicians and other employees who utilize the Prisma Software for patient treatment. Defendant's request for clarification in this regard is therefore granted.

Third, the Court finds that its directive in the Preliminary Injunction to retrieve, return, and preserve communication and documents regarding Plaintiff's trade secrets is not contradictory. As outlined by Plaintiff, Defendant may both return and retrieve these

12

communications and documents while also preserving copies of them for its records.  To the extent that Defendant seeks clarification, the Court finds this is an adequate resolution of any confusion caused by the Court's prior Order.

For these reasons, Defendant's Motion is denied on all grounds to the extent it seeks reconsideration of the Court's prior Order as Defendant has not established sufficient grounds for reconsideration.  To the extent Defendant seeks clarification of the Court's prior Order, Defendant's Motion is granted in part and denied in part as set out above.

## B.  Motion to Dismiss

Defendant moves to dismiss Plaintiff's Amended Complaint in its entirety.  ECF No. 18-1 at 1.  The Court addresses the sufficiency of the allegations as to each of Plaintiff's claims below.

### A.  SCTSA and FDTSA

Plaintiff brings claims against Defendant for misappropriation of trade secrets under both the SCTSA and FDTSA.  ECF No. 1-1 at 68–72.  Defendant asserts that Plaintiff's SCTSA and FDTSA claims fail because Plaintiff's alleged trade secrets were publicly disclosed in its federal patent filing.  ECF No. 18-1 at 7.  Because the information was purportedly available in the public domain, Defendant argues that none of the five identified operations of Glucommander constitutes as a trade secret.  *Id.* at 10–13. Plaintiff contends that the existence of a trade secret is a highly technical fact question that is not appropriately decided on a 12(b)(6) motion.  ECF No. 31 at 2.  Plaintiff further asserts that its factual allegations, including Defendant's alleged acknowledgement that the information it needed to recreate the algorithm that enabled services provided by

13

Plaintiff's product was not publicly available and was based upon and contained trade secrets and other confidential information, also creates a fact question as to the existence of trade secrets. *Id.* at 3, 5–6. Plaintiff argues its allegations support that what was disclosed in the patents relied upon by Defendant to argue that this information was publicly available were not the trade secrets that Defendant stole and that the patents do not reveal trade secrets. *Id.*

To succeed on a claim for misappropriation of trade secrets, a plaintiff must establish the existence of a trade secret and actual or threatened misappropriation of that trade secret. *See Nucor Corp. v. Bell*, No. 2:06-CV-02972-DCN, 2008 WL 9894350, at *8 (D.S.C. Mar. 14, 2008) (citing *Lowndes Prods., Inc. v. Brower*, 191 S.E.2d 761, 764 (S.C. 1972); *Williams v. Riedman,* 529 S.E.2d 28, 42 (S.C. Ct. App. 2000); S.C. Code Ann. § 39-8-50(A)); *Boon Ins. Agency, Inc. v. Lloyd*, No. 3:20-CV-02980-JMC, 2020 WL 5052956, at *4 (D.S.C. Aug. 27, 2020) (citing 18 U.S.C. § 1836(b)(1), (3)(A)–(B)).

The SCTSA and the FDTSA define "trade secret" in an almost identical manner. Under the SCTSA, a trade secret:

> (a) information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:
>
> > (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use; and
> >
> > (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*See* S.C. Code Ann. § 39-8-20(5)(a). Similarly, under the FDTSA, a trade secret:

14

means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3). The burden of establishing the existence of a trade secret rests on the plaintiff. *See Lowndes Prods.*, 191 S.E.2d at 765. A misappropriation of a trade secrets claim requires parties to specifically identify the trade secrets at issue. *Carolina Chem. Equip. Co. v. Muckenfuss*, 471 S.E.2d 721, 724-25 (S.C. Ct. App. 1996). In this context, a trade secret may exist in a unique combination or compilation of information otherwise publicly available. *See Lowndes Prods.*, 191 S.E.2d at 764; *see also Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, Nos. 89-1580 & 89-1588, 1991 WL 54118, at *3 (4th Cir. Apr. 15, 1991), *as amended* May 6, 1991. However, such a compilation trade secret must be sufficiently identified to provide reasonable details concerning the information which makes up the secret and how that information relates together to form the secret. *See Decision Insights, Inc. v. Sentia Group, Inc.*, 311 F. App'x 586, 594–95 (4th Cir. 2009). Even if some portions of a compilation of confidential information are publicly available, it can still be considered, in its entirety, as a trade

15

secret. *See IHS Global Ltd. v. Trade Data Monitor, LLC*, C/A No. 2:18-cv-01025-DCN, 2021 WL 2134909, at *7 (D.S.C. May 21, 2021).

The Court finds Plaintiff has sufficiently alleged that its algorithms—including dynamic adjustment of the multiplier, proprietary timing of blood glucose checks, management of hyperglycemic crisis, mealtime insulin dosing recommendations, and intravenous to subcutaneous insulin transition recommendations—developed for Glucommander's software system constitute "trade secrets" under both the SCTSA and FDTSA definitions. Plaintiff's allegations further support the plausible inference that the specifics of how Glucommander's algorithms make adjustments or exceptions in its operation are not disclosed to the public. Defendant's citations to articles and patent applications outside the four corners of the Amended Complaint are not properly considered on a motion to dismiss.[3] Moreover, these citations to documents outside the four corners of the Amended Complaint do not necessarily mean that the information disclosed in these documents constitute the trade secrets Plaintiff seeks to protect. As the Fourth Circuit has explained, a "trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret." *Woven Elecs. Corp.*, 930 F.2d 913, at *4 (applying South Carolina law). At this point, based on Plaintiff's allegations, it does not appear that the information needed to recreate Glucommander's "unified process, design and operation" was in the

---

[3] The Court declines to convert Defendant's Motion to Dismiss to a Motion for Summary Judgment.

16

public domain.  Accordingly, the Court finds Plaintiff has alleged with sufficient particularity the existence of "trade secrets" when it comes to Glucommander's specific algorithms.

Further, the Court finds that Plaintiff has sufficiently alleged Defendant's actual or threatened misappropriation of its "trade secrets."  *See* S.C. Code Ann. § 39-8-50(A) (providing that "[a]ctual or threatened misappropriation may be enjoined"); 18 U.S.C. § 1836(b)(3)(A); S.C. Code Ann. § 39-8-50(C); 18 U.S.C. § 1839(b)(3)(A)(i) (authorizing the court to grant an injunction "to prevent any actual or threatened misappropriation"). Plaintiff has alleged that disclosure has been contemplated by Defendant's employees, and thus a threat of misappropriation of its trade secrets has been sufficiently alleged. Accordingly, the Court finds that Plaintiff has sufficiently alleged claims under both the FDTSA and SCTSA, and Defendant's Motion to Dismiss is denied as to these claims.

B.  Breach of Contract

Plaintiff brings a claim for breach of contract.  ECF No. 1-1 at 66–68.  Defendant argues Plaintiff's contract law claim is preempted by federal patent law.  ECF No. 18-1 at 2, 7.  Defendant contends that because the information at issue was in the public domain and was accordingly not a trade secret, Plaintiff may not use state contract law to retain control of information in the public domain.  *Id.* at 7–14.  Defendant further asserts that reverse engineering is allowable and if Plaintiff were able to contract to foreclose Defendant's ability to discern information, Plaintiff would be able to remove information from the public domain via contract.  *Id.* at 14.  Accordingly, Defendant argues that Section 2.2 of the Agreement is preempted by federal patent law.  *Id.*  Plaintiff argues that its

17

reverse engineering contract provision is not preempted by federal law.  ECF No. 31 at 9–10, 17.  Plaintiff also asserts that there are other provisions of the contract that are at issue in its breach of contract claim that do not involve the reverse engineering provision and which Defendant does not challenge.  *Id.* at 10.

To recover for a breach of contract in South Carolina, a party must prove: (1) a binding contract was entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach.  *See Fuller v. E. Fire & Cas. Ins. Co.,* 124 S.E.2d 602, 610 (S.C. 1962).  A breach of contract is defined as a "[v]iolation of contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance."  Black's Law Dictionary 225 (10th ed. 2014).  The Court finds that Plaintiff has sufficiently alleged a breach of contract claim.

First, Plaintiff alleges the Parties entered a valid and enforceable contract.  ECF No. 1-1 at 54–56.  In the Agreement, the Parties allegedly agreed to the following terms:

> [Defendant] shall not and shall not permit anyone else (including its Affiliates) to, directly or indirectly, copy, reproduce, amend, modify, create derivative works of, adapt, translate, distribute, reverse engineer, reverse assemble, disassemble, decompile, attempt to discover the source code or structure sequence or organization of any software accessed or provided hereunder. . . . [Defendant] shall not, directly or indirectly, and shall not permit anyone else (including its Affiliates) to access or use the Glytec Services or Documentation in any manner in connection with or to develop a commercially available or competing product or service. . . . The Glytec Service is a product proprietary to [Plaintiff] based upon and containing trade secrets and other confidential information of [Plaintiff], and [Plaintiff] owns all right, title, interest, including all intellectual property rights, in and to the Glytec Service and documentation.

ECF No. 1-1 at 55.  The Parties agreed that Defendant's healthcare professionals could use Plaintiff's service "solely for the treatment of patients in accordance with the terms of this Agreement."  *Id.*  As part of Plaintiff's service, Plaintiff provided access to the Test Site that Defendant's clinicians could use as a training environment and information technology (IT) personnel could use for testing upgrades to the Plaintiff's services.  *Id.* As part of the Agreement, the Test Site was intended to be used solely by clinicians or IT personnel in connection with their treatment of patients and was not to be used as an aid to developing or testing software to replace Glucommander.  *See id.*

Plaintiff alleges that Defendant breached these terms by reverse engineering software accessed or provided under the contract; by allowing its employees to access or use Plaintiff's Test Site to developing a commercially available or competing product or service; and by using documents, forms, reports, and user manuals provided as part of the Plaintiff's services to create similar documents, forms, reports and user manuals for the Prisma Software.  *See* ECF No. 1-1 at 56–64, 66–68.  Specifically, Plaintiff alleges Defendant's employees were tasked with developing a replacement for Glucommander and provides internal communications between Defendant's employees setting out how they intended to reverse engineer and test this against Glucommander.  *Id.* at 56–61. Further, Plaintiff has alleged damages as a direct and proximate result of this breach. ECF Nos. 1-1 at 67; 35 at 16.  Accordingly, there are sufficient factual allegations, and supporting evidence, to conclude there exists a likelihood of success on the merits as to all the elements of a breach of contract.

Turning to Defendant's argument that Plaintiff's breach of contract claim is preempted by federal patent law, the Court is not convinced.  Defendant's arguments rely

19

on its assertion that the information Plaintiff claims are "trade secrets" was placed in the public domain when Plaintiff sought federal patent protection. However, as outlined above, a "trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret." *Woven Elecs. Corp.*, 930 F.2d 913, at *4 (applying South Carolina law). Thus, as the Court explained above, Plaintiff's allegations regarding the unique configurations of Glucommander's algorithms and how its software resolves conflicting clinical inputs plausibly is not apparent from publicly available information. Furthermore, Plaintiff makes allegations of Defendant's employees' own comments that indicate that the information Defendant sought to reverse engineer was not publicly available.

Accordingly, the Court is not persuaded that Plaintiff is attempting to use state contract law to prevent Defendant from accessing information that is available in the public domain. Therefore, the Court finds Plaintiff's allegations are sufficient to allege its breach of contract claim and are not preempted by federal patent law. Further, as noted by Plaintiff, Plaintiff's breach of contract claim involves more than just alleged reverse engineering. Plaintiff also alleges that Defendant used its Test Site and used documents, forms, reports, and user manuals in a manner that breached the Agreement. This conduct is likewise sufficient, independent of Plaintiff's claims of improper reverse engineering, to allege that Defendant's conduct breached the Agreement. For these reasons, Defendant's Motion to Dismiss is denied as to the Plaintiff's breach of contract claim.

C. <u>Breach of Contract Accompanied by a Fraudulent Act</u>

20

Defendant first asserts that, because of its status as a nonprofit charitable organization, punitive damages are not available against it, and accordingly Plaintiff's claim for breach of contract accompanied by a fraudulent act fails as a matter of law. ECF No. 18-1 at 2, 14–16. Defendant further argues that Plaintiff has failed to sufficiently allege a fraudulent act by Defendant that is separate and distinct from its breach of contract allegations. *Id.* at 2, 16–21. According to Defendant, some of Plaintiff's allegations are simply a recasting of its breach of contract claim allegations, while other allegations are protected under Rule 408 of the Federal Rules of Evidence as communications with counsel in anticipation of litigation or that occurred during settlement discussions, and even these allegations are remote in character from the breach alleged and too attenuated to support Plaintiff's claim for breach accompanied by a fraudulent act. *Id.* at 16–21.

Plaintiff contends that because its allegations are not personal injury claims based on the acts of Defendant's individual employees, Defendant is not immune from punitive damages under the South Carolina law. ECF No. 31 at 11. Plaintiff asserts its claims sound in contract, not in tort, and either way the immunity Defendant seeks to implicate applies only to personal injury claims. *Id.* at 11–12. Plaintiff argues that Defendant's fraudulent intent and fraudulent act may be shown by the circumstances surrounding the breach. *Id.* at 13–16. Plaintiff points to several of its allegations of Defendant's allegedly fraudulent conduct including Defendant's employee's contact with Plaintiff under the guise of help with operations in an attempt to assist Defendant in the development of its competing product and reverse engineering efforts as well as Defendant's employees comments about Plaintiff being "on to us" when Plaintiff asked for a meeting about

21

renewing the agreement between the Parties as all plausibly supporting the inference that

Defendant's breach was accompanied by a fraudulent act. *Id.* Plaintiff further argues

that Defendant's reliance on materials outside the Amended Complaint to support its

argument that comments about using a third-party vendor were made in the context of

settlement is misplaced at this stage of litigation and involves a question of fact better

resolved later. *Id.* at 14. Plaintiff finally asserts that Defendant's comments are not

remote because they are connected to the breach, which was still allegedly ongoing at

the time. *Id.* at 15–16.

First, addressing whether Defendant is immune from punitive damages available

under a successful claim for breach of contract accompanied by a fraudulent act because

of its status as a nonprofit charitable organization, neither Party cites to case law that

directly addresses this issue nor can the Court find any from its own independent

research. *See* ECF Nos. 18-1, 31, 40. It seems that courts have not yet had the

opportunity to consider whether recovery of punitive damages on a breach of contract

claim accompanied by fraudulent act is precluded by S.C. Code Ann. § 33-56-180, which

provides in relevant part:

> A person sustaining an injury or dying by reason of the tortious
> act of commission or omission of an employee of a charitable
> organization, when the employee is acting within the scope of
> his employment, may recover in an action brought against the
> charitable organization only the actual damages he sustains
> in an amount not exceeding the limitations on liability imposed
> in the South Carolina Tort Claims Act in Chapter 78 of Title
> 15.

The Parties do not dispute whether Defendant qualifies as a charitable organization under

the statute. *See* ECF Nos. 1-1 at 48; 18-1 at 16; 31 at 11–12. Instead, the issue appears

to be whether breach of contract accompanied by a fraudulent claim constitutes a "tortious

22

act of commission or omission of an employee of a charitable organization."  *See* ECF Nos. 18-1 at 15–16; 31 at 11–12; 40 at 9–11.

A claim for breach of contract accompanied by a fraudulent act is a claim sounding in contract law, and some South Carolina courts have gone as far as stating that a claim for breach of contract accompanied by a fraudulent act is not a separate and distinct cause of action from breach of contract.  *See, e.g.*, *Smith v. Canal Ins.*, 269 S.E.2d 348, 350 (S.C. 1980) ("There is no cause of action distinct from breach of contract for breach of contract accompanied by a fraudulent act. . . . Rather, in order to recover punitive damages for breach of contract, the plaintiff must show the breach was accomplished with a fraudulent intention and was accompanied by a fraudulent act." (citations omitted)); *Palmetto Health Credit Union v. Open Sols. Inc.*, No. 3:08-CV-3848-CMC, 2010 WL 2710551, at *5 (D.S.C. July 7, 2010), *clarified on denial of reconsideration*, No. 3:08-CV-3848-CMC, 2010 WL 3521609, at *5 n.8 (D.S.C. Sept. 7, 2010) ("Under South Carolina law, proof of a fraudulent act accompanying a breach of contract provides a basis for enhancing damages for breach of contract. It is not, as Palmetto seems to suggest, a separate tort-based theory of recovery which might survive the contractual choice-of-law provision. Even if deemed a separate cause of action, the claim would be so clearly dependent on proof of breach of the Agreement that it would, necessarily, 'arise under' the Agreement and be subject to the Agreement's choice of law provision."); *Perkins v. Bennett*, No. CIV.A. 7:14-1057-BHH, 2015 WL 1313247, at *4 (D.S.C. Mar. 24, 2015) (recognizing that plaintiff's cause of action for breach of contract accompanied by a fraudulent act sounds in contract and is governed by the limitations period for contract

23

actions (citations omitted)).  However, courts have also recognized that, while ultimately treated as a claim sounding in contract, the fraud element of this type of claim, which allows for recovery of punitive damages, sounds in tort.  *See, e.g.*, *Peeples v. Orkin Exterminating Co.*, 135 S.E.2d 845, 847 (S.C. 1964) ("An action for breach of contract accompanied by a fraudulent act is an action *ex contractu*, not *ex delicto*, . . . however, it partakes of elements of both contract and tort." (citations omitted)); *Lister v. NationsBank of Delaware, N.A.*, 494 S.E.2d 449, 454–58 (S.C. Ct. App. 1997) (analyzing choice of law for a breach of contract claim accompanied by a fraudulent act under both the choice of law provisions controlling tort and contract law without deciding ultimately into which category the claim falls).  But, as noted above, the Parties do not cite to and the Court could not find any case law where a court has had occasion to decide whether immunity for "tortious acts" under S.C. Code Ann. § 33-56-180 was intended to extend to a contract claim with a tortious element.  Moreover, the Court cannot find any case law addressing whether S.C. Code Ann. § 33-56-180 extends to the context of fraud claims or intentional torts more generally.

At this procedural posture and given the uncertainty of the law in this area, the Court finds that deciding the issue of whether certain damages are available is premature. Courts have repeatedly found that the question of the availability of damages is often premature at the motion-to-dismiss stage.  *See, e.g.*, *Meeks v. Emiabata*, No. 7:14CV00534, 2015 WL 1636800, at *2 (W.D. Va. Apr. 13, 2015) (recognizing that Federal Rule Civil Procedure "12(b)(6) does not provide a vehicle to dismiss a portion of relief sought or a specific remedy, but only to dismiss a claim in its entirety"); *Presley v.*

24

*City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) ("'The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'") (citation omitted); *Weirton Area Water Bd. v. 3M Co.*, C/A No. 5:20-102, 2020 WL 7776542, at *8 (N.D.W. Va. Dec. 30, 2020) ("It is premature to rule upon the issue of damages in the context of a motion to dismiss stage as there has been no discovery or development of a record in this case."). The Court is persuaded by the reasoning of these other courts and declines to find that Plaintiff's claims for punitive damages are barred as a matter of law at the motion to dismiss stage.[4]   Because the Court does not decide at this juncture whether punitive damages are available against Defendant on breach of contract accompanied by a fraudulent act claim, it also declines to address whether a claim for breach of contract accompanied by a fraudulent remains viable where such damages are not available.[5]

---

[4] For these reasons, the Court also declines to address Defendant's arguments concerning applicability of immunity under S.C. Code Ann. § 33-56-180 from certain damages potentially available pursuant to Plaintiff's other claims, such as its SCUTPA and misappropriation of trade secrets claims.

[5] Given that no court, including the Supreme Court of South Carolina, has been directly presented with the issues raised herein, the Court encourages the Parties to consider whether certifying a question to the Supreme Court of South Carolina would be an appropriate course of action to clarify (1) Whether Plaintiff is barred from recovering punitive damages and treble damages pursuant to its claims for (a) Breach of Contract Accompanied by a Fraudulent Act; (b) Violation of SCUTPA; (c) Misappropriation of Trade Secrets Under the SCTSA; and (d) Misappropriation of Trade Secrets under the FDTSA based on charitable organization immunity as provided in S.C. Code Ann. § 33-56-180; and (2) if Plaintiff is barred from recovering punitive damages based on S.C. Code Ann. § 33-56-180, does this mean its claim for Breach of Contract Accompanied by a Fraudulent Act fails as a matter of law.

Turning to the sufficiency of Plaintiff's allegations, the Court concludes that Plaintiff has sufficiently alleged facts plausibly establishing the elements of a breach of contract accompanied by a fraudulent act to survive a motion to dismiss. To establish a claim for breach of contract accompanied by a fraudulent act, a plaintiff must demonstrate: "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Connor v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002). Plaintiff alleges that Defendant breached the Agreement by reverse engineering software accessed or provided under the Agreement, by allowing its employees to access or use Plaintiff's Test Site to developing a commercially available or competing product or service, and by using documents, forms, reports, and user manuals provided as part of the Plaintiff's services to create similar documents, forms, reports and user manuals for the Prisma Software. *See* ECF No. 1-1 at 56–64, 66–68. Plans to reverse engineering Plaintiff's Software allegedly began as early as May 2023, and the last time Plaintiff's Test Site was used was in April 2024. ECF No. 1-1 at 57–64. Plaintiff alleges Defendant acted fraudulently by attempting to obtain information from Plaintiff's employees through false pretenses and lying to Plaintiff to conceal its breach. *Id.* at 1-1 at 61, 63, 73. Specifically, Plaintiff alleges that Defendant's employees stated "Yikes, looks like they are on to us!" after it had begun reverse engineering Plaintiff's software in the context of Plaintiff's request to discuss renewing the Agreement, and then indicating to Plaintiff that Defendant had chosen not

to reup its contract because it had decided to go with a third-party vendor.[6] *Id.* at 63, 73. The Court finds these allegations are sufficient to plausibly allege all the elements of a claim for breach of contract accompanied by a fraudulent act.

The Court is not convinced by Defendant's argument that Plaintiff has failed to allege an act of fraud distinct from its breach of contract claim. As discussed above, the basis of Plaintiff's breach of contract claim are the allegations that Defendant reverse engineered Plaintiff's software; allowed its employees to access or use Plaintiff's Test Site to test the Prisma Software; and used documents, forms, reports, and user manuals provided by Plaintiff to create similar documents, forms, reports and user manuals for the Prisma Software. *See* ECF No. 1-1 at 56–64, 66–68. However, with regard to its breach of contract accompanied by a fraudulent act, Plaintiff also alleges that at least one of Defendant's employees reached out to Plaintiff in attempt to obtain information to support the development of the Prisma Software "under the guise of seeking information to assist

---

[6] Defendant argues that its employees' comments about going with another vendor were made in the context of settlement discussions and are therefore not admissible under the Federal Rules of Evidence. ECF No. 18-1 at 19. Given the procedural posture, the Court finds that it is premature to determine the admissibility of these statements at this time. *Hux v. Johnson & Johnson*, No. 323CV00215, 2024 WL 189438, at *1 (W.D.N.C. Jan. 17, 2024) ("[T]he Court need not resolve at this juncture whether any admissible evidence supports these allegations, as that is not the inquiry on a motion to dismiss."); At this stage of the litigation, the standard is whether the well-pleaded Amended Complaint contains enough factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Whether this evidence is admissible as relevant, probative and permissible, is a decision that can only be made in a legal and factual context, which cannot be determined from the pleadings standing alone." *Abercrombie & Fitch Co. v. Fed. Ins. Co.*, No. 2:06-CV-831, 2008 WL 656029, at *5 (S.D. Ohio Mar. 11, 2008). Accordingly, the Court considers all of Plaintiff's allegations with due regard to pleading standard required under the Rules of Civil Procedure, without yet determining whether admissible evidence will support these allegations.

patients using Glucommander." *Id.* at 61. Plaintiff also alleges comments by Defendant's employees that, drawing all inferences in Plaintiff's favor, plausibly support the conclusion that Defendant made false representations to Plaintiff in an attempt to conceal its breach and continue to receive the benefit of the Agreement for its own benefit. *Id.* at 63, 73. This alleged conduct is sufficiently distinct from Defendant's other conduct and, drawing all inferences in Plaintiff's favor, plausibly indicates both a fraudulent intent relating to breaching the contract and a fraudulent act accompanying the breach.

The Court also finds that, based on Plaintiff's allegations, Defendant's allegedly fraudulent conduct and statements related thereto were not remote from the breach of contract. The fraudulent act, which underlies the breach of contract accompanied by a fraudulent act claim "may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character." *Floyd v. Country Squire Mobile Homes, Inc.*, 336 S.E.2d 502, 504 (S.C. Ct. App. 1985) (citations omitted). Plaintiff alleges that Defendant's reverse engineering efforts began at earliest in May 2023 and that Defendant continued to use Plaintiff's Test Site to run patient simulations on the Prisma Software it created through reverse engineering through April 22, 2024. ECF No. 1-1 at 56–60; 64. Defendant's allegedly fraudulent conduct all occurred during this time. Accordingly, the Court finds that Plaintiff has plausibly asserted a claim for breach of contract accompanied by a fraudulent act, and Defendant's Motion to Dismiss is denied as to this claim.

D. SCUPTA

Defendant argues that Plaintiff has failed to plead facts sufficient to show Defendant's actions had an adverse impact on public interest outside of the impact on the Parties' specific to this transaction, which is an essential element of a SCUPTA claim. ECF No. 18-1 at 21–23.  Plaintiff contends that it has sufficiently alleged an impact on public interest as it has alleged Defendant's conduct is capable of repetition and are part of a pattern of behavior, Defendant has disclosed trade secrets to competitors and other hospitals, and Defendant used Plaintiff's Test Site without approval from Plaintiff or the FDA to test its created software on patients, placing the public at risk.  ECF No. 31 at 16.

SCUTPA creates a private right of action in favor of any person who suffers an ascertainable loss of money or property "as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by [this Act]." S.C. Code Ann. § 39-5-140(a).  In order to establish a SCUTPA violation, a plaintiff must demonstrate "(1) that the defendant has engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest." *Havird Oil v. Marathon Oil Co., Inc.,* 149 F.3d 283, 291 (4th Cir. 1998).

Plaintiff alleges Defendant engaged in an unlawful trade practice by, but not limited to, its conduct in reverse engineering Plaintiff's software.  ECF No. 1-1 at 74.  This "reverse engineering" conduct allegedly included not only Defendant's effort to source and determine the trade secrets pertaining to the algorithms that made Glucommander function, but also Defendant's potential dissemination of those trade secrets to third

29

parties and use of Plaintiff's Test Site to test its reverse engineered product on patients from the community. *Id.* at 47, 64, 71, 74. Plaintiff alleges that Defendant did not have FDA clearance for the Prisma Software when it tested it on patients and that patients had negative outcomes because of the use of the Prisma Software. *Id.* at 47, 64. Plaintiff further alleges that it has suffered damages because of Defendant's unlawful trade practice. *Id.* at 74. Plaintiff alleges Defendant's conduct is capable of repetition and that its actions were part of a "pattern of behavior" by Defendant. *Id.* at 73–74.

Defendant argues that Plaintiff's SCUTPA claim fails to plausibly implicate the public interest. However, the Court finds these arguments are unpersuasive. The Court agrees that Plaintiff's general allegations that Defendant's conduct is capable of repetition and are part of a pattern of behavior is nothing more than a conclusion of law and recitation of the elements of its claims, which alone are insufficient to allege the public interest is implicated by its claim. *See Prince Payne Enterprises, Inc. v. Tigua Enterprises, Inc.*, No. 2:18-cv-2552-DCN, 2019 WL 5394197, at *6 (D.S.C. Oct. 22, 2019) ("[M]ere recitals of the elements of a SCUTPA claim without allegations of fact to support these legal conclusions . . . are . . . insufficient to state a SCUTPA claim."). However, Plaintiff also makes specific allegations that do appear to implicate the public interest, most notably its allegations that Defendant, in violation of its Agreement with Plaintiff, tested the Prisma Software on patients in Plaintiff's Test Site both without FDA approval and without Plaintiff's permission. *See* ECF No. 1-1 at 47, 64. Defendant does not address its use of Plaintiff's Test Site to test its Prisma Software on patients. *See* ECF Nos. 18-1, 40. This alleged conduct by Defendant goes beyond the contractual

30

relationship between Plaintiff and Defendant, which indisputably prohibited reverse engineering and using the Test Site for purposes other than those anticipated under the Agreement.  The Court finds that a hospital system testing a product that regulates a patient's insulin in another entity's test site without FDA approval or that other entity's permission plausibly implicates the public interest.  Not only are Defendant's alleged actions potentially capable of repetition, they also directly implicate public safety and health of parties outside those involved in this action.  Accordingly, the Court finds that Plaintiff has plausibly alleged a claim for violation of SCUTPA, and Defendant's Motion to Dismiss is denied as to this claim.

E.  Unjust Enrichment

Defendant argues that because there is an express contract between the Parties, Plaintiff's cause of action for unjust enrichment is precluded.  ECF No. 18-1 at 23. Defendant also contends that Plaintiff's claim for unjust enrichment fails because reverse engineering is not prohibited under the common law.  *Id*.  Plaintiff contends that it is permitted to plead in the alternative and so its unjust enrichment claim should be allowed to proceed.  ECF No. 31 at 16–17.  Plaintiff also argues that because of the equitable nature of an unjust enrichment claim, Plaintiff is still permitted to recover based on Defendant's reverse engineering of its software because this conduct was a breach of the Parties' confidential relationship.  *Id.* at 17.

"An unjust enrichment claim is based on a judicially implied contract, allowing courts to afford relief when no enforceable contract exists, or harm falls outside of a contract's scope."  *Thompson v. Killian*, 924 S.E.2d 606, 614 (S.C. 2025), *reh'g denied*

31

(Jan. 16, 2026) (citations omitted).   Accordingly, courts have recognized that "[t]he existence of an express contract bars a claim for unjust enrichment, quantum meruit, or other quasi-contractual claims."  *See, e.g.*, *Est. of Taylor v. John Alden Life Ins. Co.*, 574 F. Supp. 3d 347, 357 (D.S.C. 2021) (citing *Swanson v. Stratos*, 564 S.E.2d 117, 119 (S.C. App. 2002); *Boldt Co. v. Thomason Elec. & Am. Contractors Indem. Co.*, 820 F. Supp. 2d 703 (D.S.C. 2007)).   However, courts have allowed a plaintiff to proceed on both a cause of action for breach of contract and for unjust enrichment at the motion-to-dismiss stage, so long as both causes of action are plausibly alleged.  *See, e.g.*, *Trevillyan v. APX Alarm Sec. Sys., Inc.*, No. CA 2:10-1387-MBS, 2011 WL 11611, at *9 (D.S.C. Jan. 3, 2011) (allowing a plaintiff to proceed on an unjust enrichment claim at the motion-to-dismiss even where the plaintiffs alleged the parties' relationship was governed by an express contract); *Creaturo v. Wells Fargo Bank NA*, No. CV 2:11-2798-RMG, 2012 WL 13005318, at *4 (D.S.C. Apr. 30, 2012) (denying a defendant's motion to dismiss the plaintiff's unjust enrichment claim because, even though plaintiff plead there was an express contract between the parties, a plaintiff may seek alternative remedies and unjust enrichment is pleaded in the alternative to the breach of contract action).  A plaintiff may plead in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2).  Further, "[u]nder South Carolina law, 'when an identical set of facts entitle the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both.'" *Enhance-It, L.L.C. v. Am. Access Tech., Inc.,* 413 F. Supp. 2d 626, 632 (D.S.C. 2006) (quoting *Minyard Enter., Inc. v. Se. Chemical & Solvent Co.,* 184 F.3d 373, 381 (4th Cir. 1999)).  Generally, a party is not required to make an election of

32

remedies until after the verdict is entered and prior to the entry of judgment. *Id.* (citing *Minyard Enter.,* 184 F.3d at 381).

To establish a claim for unjust enrichment, a plaintiff must demonstrate: "(1) he conferred a non-gratuitous benefit on the defendant; (2) the defendant realized some value from the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." *Inglese v. Beal*, 742 S.E.2d 687, 691 (S.C. Ct. App. 2013) (citations omitted). Plaintiff alleges that Defendant improperly used and accessed Plaintiff's services to reverse engineer its own competing product—the Prisma Software. ECF No. 1-1 at 74. Plaintiff alleges that Defendant saved significant costs in developing the Prisma Software by using Plaintiff's services. *Id.* at 75. Plaintiff further alleges that Defendant's retention of this benefit was inequitable, and that the "confidential information" Defendant used to develop the Prisma Software was obtained because of the access Defendant had to this information through its relationship with Plaintiff. *Id.* at 54, 59–60, 65, 75. The Court finds that these allegations are sufficient to state a claim for unjust enrichment.

Further, Plaintiff's allegations plausibly support that the reverse engineering occurred in the context of the Parties' confidential relationship, where Defendant's allegedly took advantage of its exclusive access to Plaintiff's confidential information. Accordingly, the Court is not convinced that Plaintiff's claims for unjust enrichment are barred by the fact that there is no prohibition against reverse engineering at common law. *See Servo Corp. of Am. v. Gen. Elec. Co.*, 337 F.2d 716 (4th Cir. 1964) (finding the district court erred in rejecting the master's findings that a claim for unjust enrichment was

supported by the facts in the record where evidence supported that a confidential relationship existed between plaintiff and a railroad company during installation and testing of plaintiff's device and that the railroad made a disclosure which permitted defendant to copy plaintiff's device); *see also Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953) ("It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product.  The fact is that they did not.  Instead[,] they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment.").  In this context and drawing all inferences in Plaintiff's favor, Defendant's alleged conduct, although it may not be expressly prohibited by law, plausibly resulted in the retention of a benefit by Defendant under circumstances that made it inequitable for it to retain it without paying its value. *Inglese*, 742 S.E.2d at 691 Because Plaintiff has sufficiently stated a claim for unjust enrichment, it may, at this procedural posture, plead both claims for breach of contract and, in the alternative, for unjust enrichment.  *Trevillyan*, 2011 WL 11611, at *9. Accordingly, Defendant's motion to dismiss is denied as to Plaintiff's claim for unjust enrichment.

## C.  Motion to Strike

Defendant moves to strike Plaintiff's jury demand because Plaintiff allegedly waived its right to trial by jury by contract.  ECF No. 19-1 at 4–7.  Specifically, Defendant cites to the following provision in its contract with Plaintiff: "Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this agreement or the transactions contemplated hereby."  ECF

No. 19-2 at 5.  Defendant contends that this waiver is clear and unambiguous and applies to all of Plaintiff's claims because based on Plaintiff's own allegations in its Amended Complaint, all its actions arise out of or our related to the Agreement.  ECF No. 19-1 at 6–7.  Plaintiff does not deny that it assented to the waiver present in its agreement with Defendant.  *See* ECF No. 30.  However, Plaintiff contends that its waiver did not include the claims raised against Defendant because these claims are based upon Defendant's allegedly fraudulent conduct.  *Id.* at 2.  Plaintiff argues that it could not have knowingly waived its jury trial rights for its claims arising from Defendant's "theft of its trade secrets" and "the continued use and disclosure of those trade secrets."  *Id.*

In South Carolina, "[a] party may waive the right to a jury trial by contract." *Skywaves I Corp. v. Branch Banking & Tr. Co.*, 814 S.E.2d 643, 652 (S.C. Ct. App. 2018) (alteration in original) (quoting *Wachovia Bank, Nat'l Ass'n v. Blackburn*, 755 S.E.2d 437, 443 (S.C. 2014), *abrogated on other grounds by Deutsche Bank Nat'l Tr. Co. v. Est. of Houck*, 892 S.E.2d 280, 281–82 (S.C. 2023)).  "The right of trial by jury is highly favored, and waivers of the right are always strictly construed and not lightly inferred or extended by implication." *Keels v. Pierce*, 433 S.E.2d 902, 904 (S.C. Ct. App. 1993).  "In absence of an express agreement or consent, a waiver of the right to a jury trial will not be presumed."  *Id.*  While jury trial waivers are strictly construed, they are nevertheless construed according to their "plain, ordinary and popular meaning."  *Beach Co. v. Twillman, Ltd.*, 566 S.E.2d 863, 866 (S.C. Ct. App. 2002), *abrogated on other grounds by Deutsche Bank Nat'l Tr. Co.*, 892 S.E.2d at 281–82; *see also Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 649 S.E.2d 494, 502 (S.C. Ct. App. 2007) ("If a contract's language is plain, unambiguous, and capable of only one reasonable

35

interpretation, no construction is required and its language determines the instrument's force and effect.").

Plaintiff asserts six causes of action against Defendant: breach of contract; misappropriation of trade secrets under the FDTSA and under the SCTSA; breach of contract accompanied by a fraudulent act; violation of the SCUTPA; and unjust enrichment. ECF No. 1-1 at 66–75. As provided above, the jury trial wavier provision in the Agreement applied to claims brought by either side "arising out of or relating to this agreement or the transactions contemplated hereby." ECF No. 19-2 at 5. The question before the Court is thus, which, if any, of Plaintiff's causes of action arise out of or are related to the Agreement.

In interpreting the contract language, which does not define either "arising out of" or "related to," the Court turns to statutory interpretation principles as set out in South Carolina law that require the Court to apply these terms based on their "plain, ordinary and popular meaning." *Beach Co.*, 566 S.E.2d at 866; *Ecclesiastes Prod. Ministries,* 649 S.E.2d at 502. "Related" is defined as "[c]onnected in some way; having relationship to or with something else." Related, Black's Law Dictionary (12th ed. 2024). Whereas "arise" means "to result (from)." Arise, Black's Law Dictionary (12th ed. 2024); *See also* Arise, Merriam Webster (defining "arise" as "to originate from a source."). Thus, a claim "arising out of or relating to" the Agreement or transactions contemplated thereby indicates that the claim is connected to or the result of the Agreement.

Here, without question, Plaintiff's claims for breach of contract and breach of contract by fraudulent act are the result of the Agreement for without the existence of the Agreement those claims would fail as a matter of law. *See Fuller*, 124 S.E.2d at 610

36

(explaining that establish a claim for breach of contract a party must prove (1) a binding contract was entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a direct and proximate result of the breach); *Connor*, 560 S.E.2d at 612 (outlining the elements of a claim for breach of contract accompanied by a fraudulent act to include: "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach").

Turning to Plaintiff's remaining claims, Plaintiff argues that like in *Wachovia Bank* its remaining claims should not be considered waived by the jury waiver because it should not be held to have contemplated that, in signing the Agreement, it was "agreeing to waive jury trial claims arising from allegedly fraudulent conduct." *See* ECF No. 30 at 2 (citing *Wachovia Bank v. Blackburn*, 716 S.E.2d 454, 459 (S.C. Ct. App. 2011), *aff'd in part, rev'd in part sub nom. Wachovia Bank*, 755 S.E.2d 437). The Court, however, finds *Wachovia Bank* to be readily distinguishable from this action. In *Wachovia Bank*, a promissory note was delivered by one defendant to the bank, which all defendants executed personal guaranties to secure. 716 S.E.2d at 455–56. Both the note and guaranties contained a waiver of jury trial provision that waived the right to trial by jury with respect to any litigation "based on, arising out of, under or in connection" with the "loan documents." *Id*. at 456. The bank filed a foreclosure action against the defendants asserting the note was in default and setting judgment against them. *Id*. The defendants asserted several counterclaims against the bank and demanded a jury trial. *Id*. The bank filed a motion to strike the jury trial demand, citing the jury trial waiver in the note and guaranty. *Id.* at 456–57 The circuit court granted the motion to strike, and defendants

37

appealed. *Id.* at 457. On appeal, defendants argued that their counterclaims arose from the plaintiff bank's sales misrepresentations and failure to abide by promises to build infrastructure, amenities, and docks, and did not arise from the loan documents. *Id.* at 458–59. The South Carolina Court of Appeals agreed that the defendants' counterclaims did not arise out of the same occurrence as the loan documents as required by the jury trial waivers. *Id*. at 458. The Court of Appeals explained that the defendants "could not have contemplated that in signing the note and guaranty, they were waiving their right to a jury trial on claims arising from allegedly fraudulent conduct." *Id.* at 460 (citations omitted). The Court of Appeal reasoned that "a reasonable buyer would not contemplate that a bank would partner with a developer/seller and make misrepresentations about a property and the construction of amenities" and found that the defendants' claims were related to allegations of sales misrepresentations and pre-purchase fraud and not within the scope of the waivers. *Id*.

Unlike in *Wachovia Bank* where the fraudulent conduct could not have been reasonably covered by the contract language and, thus, the parties to that contract could not have anticipated the waiver covered such conduct, the Agreement in this action explicitly sought to protect Plaintiff from the conduct that forms the basis of its claims. Here, the Agreement between Plaintiff and Defendant was a licensing agreement for Plaintiff's software that had provisions proscribing attempts to "reverse engineer" or disseminate and uncover Plaintiff's the algorithms that made Plaintiff's product function. In other words, the Agreement sought to protect Plaintiff's trade secrets and confidential information. The Agreement explicitly provides:

> Customer shall not and shall not permit anyone else (including its Affiliates) to, directly or indirectly, copy, reproduce, amend,

38

> modify, create derivative works of, adapt, translate, distribute, reverse engineer, reverse assemble, disassemble, decompile, attempt to discover the source code or structure sequence or organization of any software accessed or provided hereunder (except where the foregoing is required by applicable law, then only to the extent so permitted). . . . Customer and its Affiliates shall maintain and shall not remove, alter or obscure any trademark, copyright, product identification or other proprietary notices contained in any content available on or accessed hereunder. . . . The Glytec Service is a product proprietary to Glytec based upon and containing trade secrets and other confidential information of Glytec, and Glytec owns all right, title and interest, including all intellectual property rights, in and to the Glytec Service and documentation.

ECF No. 19-2 at 2. The Agreement further defines "confidential information" as "all financial, business or technical information, trade secrets, know-how or software. including all analyses, digests and summaries, in any form, that is disclosed by or for a party or a party is exposed to, in relation to this Agreement. and which is marked or otherwise identified as proprietary or confidential at the time of disclosure, or which by its nature would be understood by a reasonable person to be proprietary or confidential." *Id.* at 4. With regard to confidential information as defined under the Agreement, Defendant was prohibited from using or disclosing this information "without [Plaintiff's] written consent," and Defendant was required to "use commercially reasonable care to protect it, including limiting access to its employees, subcontractors and contractors who (i) have a need to know for the purposes of this Agreement and (ii) have been apprised of the confidentiality restrictions in this Agreement." *Id.*

The majority of Plaintiff's remaining claims stem from Defendant's alleged breach of these provisions of the Agreement. As to Plaintiff's claim for violation of SCUTPA, Plaintiff alleges that Defendant's conduct violated the SCUTPA "because it has engaged

39

in unfair methods of competition and/or deceptive acts or practices in the conduct of business, trade, or commerce. This includes, but is not limited to, [Defendant]'s conduct in reverse engineering [Plaintiff's] [s]oftware." ECF No. 1-1 at 74. The Agreement directly prohibits "reverse engineering" in this manner, the very conduct that forms that basis of Plaintiff's SCUTPA claim. Similarly, Plaintiff's claims for misappropriation under SCTSA and FDTSA allege that "[Defendant] misappropriated [Plaintiff's] Trade Secrets through improper means through its breach of the Agreement;" and that "[Defendant's] continued use of the Trade Secrets after the expiration of the Agreement also constitutes misappropriation under" both statutes. *Id.* at 69, 76. Again, Plaintiff's claims for misappropriation under the SCTSA and FDTSA are connected to or the result of the Agreement.

However, the Court finds that Plaintiff's claim for unjust enrichment is not covered by the jury trial waiver in the Agreement. As outlined above, a claim for unjust enrichment cannot proceed where covered by the terms of an express contract. *See, e.g.*, *Taylor*, 574 F. Supp. 3d at 357 (citing *Swanson*, 564 S.E.2d at 119; *Boldt Co.*, 820 F. Supp. 2d 703). If the Agreement were to cover Plaintiff's claim for unjust enrichment, this claim would fail as a matter of law. It follows that Plaintiff's claim for unjust enrichment cannot arise out of or be related to the Agreement, and therefore it is not subject to the jury trial waiver. Accordingly, Defendant's Motion to Strike is denied as to Plaintiff's claim for unjust enrichment.

For these reasons, the Court finds that Plaintiff's claims for breach of contract; misappropriation of trade secrets under the FDTSA and under the SCTSA; breach of contract accompanied by a fraudulent act; and violation of the SCUTPA arise out of or

are related to the Agreement and the jury trial waiver in the Agreement is therefore applicable to these claims. Accordingly, Defendant's Motion to Strike Plaintiff's jury demand is granted in part as to these claims. However, Plaintiff's claim for unjust enrichment does not arise out of the Agreement, and accordingly, Defendant's Motion to Strike is denied in part as to this claim.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Reconsideration or Clarification [52] is **DENIED** to the extent it seeks reconsideration and **GRANTED IN PART AND DENIED IN PART** to the extent it seeks clarification; Defendant's Motion to Dismiss [18] is **DENIED**; and Defendant's Motion to Strike [19] is **GRANTED IN PART AND DENIED IN PART**.

IT IS SO ORDERED.

<u>**s/ Donald C. Coggins, Jr.**</u>
United States District Judge

March 31, 2026
Spartanburg, South Carolina

41